Charles Schwab & Co. v. Marilley, 2026 NCBC 7.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

CHARLES SCHWAB & CO., INC.,

Plaintiff,

v.

LAUREN ELIZABETH MARILLEY
and PETER JOSEPH MARILLEY,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23 CVS 17361

**ORDER AND OPINION ON
DEFENDANT LAUREN
MARILLEY'S MOTION FOR
SUMMARY JUDGMENT,
DEFENDANT PETER MARILLEY'S
MOTION FOR LEAVE TO AMEND,
AND
PLAINTIFF CHARLES SCHWAB'S
MOTION FOR INTERPLEADER,
DISCHARGE, AND DISMISSAL**

1.     **THIS MATTER** is before the Court on Defendant Lauren Marilley's Motion for Summary Judgment (the Summary Judgment Motion), (ECF No. 74),[1] Defendant Peter Marilley's Motion for Leave to Amend his Answer to Ms. Marilley's First Amended Answer and Crossclaim (the Motion to Amend), (ECF No. 131), and Plaintiff Charles Schwab's Motion for Interpleader, Discharge, and Dismissal (the Motion for Interpleader), (ECF No. 115).

2.     Ms. Marilley asks the Court to declare that funds in a brokerage account held by Schwab (Restrained Assets) belong to her alone and that her father, Mr. Marilley, has no interest in them.  The undisputed facts before the Court demonstrate

---

[1] Ms. Marilley moved for partial summary judgment on her declaratory judgment claim and not on her additional claims, which sounded in tort.  (Mot. Summ. J. 1.)  Since filing her Summary Judgment Motion, Ms. Marilley voluntarily dismissed her tort claims, leaving only the declaratory judgment claim before the Court.  (Notice Partial Dismissal Without Prejudice, ECF No. 87.)  To the extent the Summary Judgment Motion requests judgment on dismissed claims, the Court **DENIES** her motion as moot.

that Ms. Marilley is entitled, as a matter of law, to a judgment declaring that the Restrained Assets belong solely to her.

3. Mr. Marilley seeks to amend his Answer to Ms. Marilley's crossclaim to add both affirmative defenses and his own crossclaim against her. The Court concludes that the proposed amendment of Mr. Marilley's Answer to Ms. Marilley's Crossclaim would be futile and comes too late.

4. Schwab requests that ownership of the Restrained Assets be resolved through interpleader and that it be discharged from further responsibility for them. The Court agrees that resolution of Ms. Marilley's Summary Judgment Motion fully adjudicates ownership of the Restrained Assets. However, to the extent Schwab's motion seeks an order that it bears no responsibility to Mr. Marilley for the circumstances leading to the transfer of the Restrained Assets to an account owned solely by Ms. Marilley, the Court **DENIES** the Motion for Interpleader. The Court previously stayed this aspect of the case when it recognized that matters between Mr. Marilley and Schwab that arose out of or were related to the Account Agreement and the services provided thereunder were subject to arbitration. *Charles Schwab & Co, Inc. v. Marilley*, 2024 NCBC LEXIS 27, at *17–18 (N.C. Super. Ct. Feb. 20, 2024), *aff'd per curiam*, 387 N.C. 185 (2025).

5. For all these reasons, and as discussed further below, the Court **GRANTS** the Summary Judgment Motion, **DENIES** the Motion to Amend, and **GRANTS in part** and **DENIES in part** the Motion for Interpleader.

*Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. by Thomas G. Hooper and David Blue, and Baritz & Colman LLP, by Neil S. Baritz, for Plaintiff Charles Schwab & Co., Inc.*

*Spengler & Agans, PLLC by Eric Spengler, for Defendant Lauren Elizabeth Marilley.*

*Krueger-Andes Law, PLLC by Matthew Krueger-Andes, for Defendant Peter Joseph Marilley.*

Earp, Judge.

## I.   FACTUAL BACKGROUND

6.   The Court does not make findings of fact when ruling on a motion for summary judgment. *See Sunamerica Fin. Corp. v. Bonham*, 328 N.C. 254, 261 (1991). Instead, the Court summarizes the undisputed facts. *See id.*

### A.   The Deemed Admissions

7.   "Facts admitted in a request for admissions under Rule 36 of the North Carolina Rules of Civil Procedure are conclusively established" and "sufficient to support a grant of summary judgment." *Wells Fargo Bank, N.A. v. Stocks*, 378 N.C. 342, 350 (2021) (citation modified) (first quoting N.C. R. Civ. P. 36(b); and then quoting *Goins v. Puleo*, 350 N.C. 277, 280 (1999)). "Moreover, a party's own affidavit opposing summary judgment does not overcome the conclusive effect of that party's previous admissions." *Id.* (quoting *Rhoads v. Bryant*, 56 N.C. App. 635, 637 (1982)) (citation modified).

8.   Requests deemed admitted for failure to timely respond in accordance with Rule 36 of the North Carolina Rules of Civil Procedure are entitled to the same conclusive effect as other admissions. *See Goins*, 350 N.C. at 281–82 (reversing when trial court failed to give deemed admissions conclusive effect at summary judgment).

This is true even when summary judgment results. *See id.* at 281 ("The entry of summary judgment . . . in this case may appear to lead to a harsh result. Nevertheless, the Rules of Civil Procedure promote the orderly and uniform administration of justice, and all litigants are entitled to rely on them. Therefore, the rules must be applied equally to all parties to a lawsuit, without regard to whether they are represented by counsel.").

9.     At the beginning of this case, even before designation to the Business Court, Ms. Marilley served interrogatories, requests for production of documents, and forty-six requests for admission on Mr. Marilley. (Aff. Serv., ECF No. 5; Designation Order, ECF No. 1.) After designation to the Business Court, at Mr. Marilley's request and with Ms. Marilley's consent, the Court extended the deadline for Mr. Marilley to respond to the interrogatories and document requests to 3 January 2024, and to respond to the requests for admission to 18 January 2024. (12/4/2023 Order Mots. Ext. Time, ECF No. 13.) Mr. Marilley did not respond to the interrogatories or document requests by 3 January 2024. On 9 January 2024, after the first deadline passed, the Court stayed discovery while the parties litigated arbitration issues before this Court and on appeal to our Supreme Court. (1/9/2024 Order Mot. Ext. Pending Deadlines, ECF No. 27; 4/15/2024 Order Concerning Applicability of Automatic Stay, ECF No. 44.)

10.     After receiving our Supreme Court's mandate, the Court lifted the appellate stay on 14 April 2025. (4/14/2025 Order Lifting Stay ¶¶ 4–5, ECF No. 48.) On 2 May 2025, the Court entered a Case Management Order in which it required Mr.

Marilley to respond to all of Ms. Marilley's outstanding written discovery requests—including the forty-six requests for admission she had served over a year prior—on or before 23 June 2025. (5/2/2025 Case Mgmt. Order ¶ IV.A.3, ECF No. 53.) After he failed to do so, the Court entered an order recognizing that Rule 36 deemed those matters admitted due to Mr. Marilley's failure to respond or object. (7/10/2025 Order Following BCR 10.9 Confs. ¶¶ 13–15, ECF No. 64.) Mr. Marilley later sought to undo the consequences of this failure by filing a motion to withdraw or amend, (ECF No. 92), and a motion to strike admissions, (ECF No. 88), (collectively the admission-related motions), both of which the Court denied. (10/8/2025 Am. Order Def. Peter Marilley's Mot. Strike & Mot. Withdraw or Amend Admiss., ECF No. 111 [10/8/2025 Order].)

11.    Now at the summary judgment stage, Mr. Marilley renews his objection to the Court's consideration of his deemed admissions. For the same reasons the Court articulated in its order on Mr. Marilley's admission-related motions, the Court again rejects his arguments. (*See* 10/8/2025 Order).

12.    Mr. Marilley also contends that certain requests for admission, including number forty-six,[2] improperly state legal conclusions and therefore cannot be deemed admitted. (Am. Br. Opp. Mot. Summ. J. 12, ECF No. 104.) However, Rule 36(a) provides that a request for admission may "relate to statements or opinions of fact *or of the application of law to fact*[.]" N.C. R. Civ. P. 36(a) (emphasis added). Our

---

[2] Request for admission forty-six states that "[Mr. Marilley] do[es] not have any legal, equitable, or other interest in and/or to any of the Restrained Assets." (Mot. Summ. J. Ex. P, Reqs. Admiss. ¶ 46, ECF No. 74.5 [Reqs. Admiss.].)

courts have approved consideration of admissions on ultimate issues such as paternity. *Wake Cnty. ex rel. Carrington v. Townes*, 53 N.C. App. 649, 658 (1981); *see also Goins*, 350 N.C. at 281–82 (affirming deemed admissions of mixed questions of law and fact, breach of standard of care); *cf. Mabe v. Dillon*, 46 N.C. App. 340, 341–42 (1980) (affirming deemed admission in pleading of citizenship, residence, *ownership*, and wrongfully taking possession when party failed to deny).

13. One of the leading treatises on North Carolina civil procedure summarizes the law by saying that "request[s] for admission may probe and even dispose of ultimate issues in an appropriate case." G. Gray Wilson, *North Carolina Civil Procedure* § 36-2 (4th ed. 2020). Accordingly, the Court gives the deemed admissions the conclusive effect the Rules require and includes them among the undisputed facts in this opinion.[3]

## B. Background Facts

14. This case centers on two brokerage accounts that Ms. Marilley's paternal grandfather, Dr. Ralph Marilley, established for her benefit.

15. The first was a Charles Schwab account (formerly TD Ameritrade) subject to a custodianship under the Uniform Transfers to Minors Act (UTMA). (Lauren Elizabeth Marilley's First-Am. Cross-cl. Agst. Def. Peter Joseph Marilley ¶¶ 5, 19, ECF No. 18 [L. Marilley Am. Cross-cl.]; Peter Joseph Marilley's Resp. L. Marilley Am. Cross-cl. ¶¶ 5, 19, ECF No. 56 [Answer Am. Cross-cl.]; Reqs. Admiss. ¶¶ 1, 4–7, 10.)

---

[3] In any event, as discussed herein, the Court observes that the record before it requires summary judgment for Ms. Marilley even without consideration of request for admission forty-six.

In accordance with the requirements of the UTMA, Dr. Marilley irrevocably gifted Ms. Marilley funds through deposits to this account in March 2005 when she was nine years old. (L. Marilley Am. Cross-cl. ¶ 5; Answer L. Marilley Am. Cross-cl. ¶ 5; Reqs. Admiss. ¶¶ 1, 4–7, 10.)

16. The second was a 529 education-savings account held with CollegeInvest, which Dr. Marilley opened for Ms. Marilley's sole benefit around February 2008 (the Original CollegeInvest Account). (Cross-cl. & Answer Ex. C, Ex 4 at 1–4, ECF No. 4 [Original CollegeInvest Account Statement]; Reqs. Admiss. ¶¶ 11–14.) Dr. Marilley funded the Original CollegeInvest Account exclusively with funds from the UTMA Account that he had already irrevocably given Ms. Marilley. (Mot. Summ. J. Ex. M, Ex 2, at Peter Marilley 0212, ECF No. 74.2 [Text Messages]; Original CollegeInvest Account Statement 1–4; Reqs. Admiss. ¶¶ 11–14.) This initial transfer of funds from the UTMA Account to the Original CollegeInvest Account was the only source of funds for the Original CollegeInvest Account at any time. (Reqs. Admiss. ¶ 13.)

17. Dr. Marilley was the custodian of all these UTMA funds until 2009 when, at age 81, he resigned, and Peter Marilley, his son and Ms. Marilley's father, became the custodian. (L. Marilley Am. Cross-cl. ¶ 19; Answer L. Marilley Am. Cross-cl. ¶ 19; Reqs. Admiss. ¶¶ 2, 8.)

18. Thus, when Mr. Marilley took over as UTMA custodian in 2009, Dr. Marilley's irrevocable UTMA gift consisted of (1) the UTMA funds remaining in the UTMA Account after the initial funding of the Original CollegeInvest Account and (2)

the UTMA funds in the Original CollegeInvest Account. (*See* Reqs. Admiss. ¶ 20 (positive balance remained in UTMA Account in 2013 after creation of Original CollegeInvest Account); Mot. Summ. J. Ex. M. ¶ 6, ECF No. 74.2 [8/4/2025 L. Marilley Aff.] (Dr. Marilley used "some of the money" in UTMA Account to fund Original CollegeInvest Account).)

19. Three additional contributions to the UTMA Account occurred between September 2013 and August 2016.[4] (Reqs. Admiss. ¶¶ 21, 27.) The first was on 15 September 2015, when $7,300 was transferred from the Original CollegeInvest Account back to the UTMA Account. (Reqs. Admiss. ¶ 22.) The second occurred on 4 January 2016, when a check for approximately $76,000 from the Marilley Family Limited Partnership, written by Dr. Marilley and payable to Ms. Marilley, was deposited into the UTMA Account. (Cross-cl & Answer Ex. C, Ex. 10, ECF No. 4 [Marilley Family L.P. Check]; Reply Br. Supp. Mot. Sanctions Ex. B, at 3, ECF No. 126.3 [UTMA Account Statements]; Reqs. Admiss. ¶¶ 8, 20–24).) Finally, on 12 January 2016, $7,300.55 was transferred from the Original CollegeInvest Account back to the UTMA Account. (Reqs. Admiss. ¶ 27.)

20. In August 2016, just before Ms. Marilley's twenty-first birthday (the age of majority under the UTMA), Mr. Marilley instructed Ms. Marilley to sign a document that purported to convert the UTMA Account into a joint brokerage account naming both Ms. Marilley and Mr. Marilley as owners. (Reqs. Admiss. ¶¶ 30, 32–36; Cross-cl & Answer Ex. D, ECF No. 4 [UTMA Conversion Appl.].) The UTMA Account

---

[4] As discussed further below, these too became irrevocable UTMA gifts to Ms. Marilley by operation of law once deposited into the UTMA Account.

conversion application Mr. Marilley instructed Ms. Marilley to sign erroneously referred to her as a "[f]ormer minor," but she had not reached the UTMA age of majority when she signed it. (UTMA Conversion Appl.; 8/4/2025 L. Marilley Aff. ¶¶ 17–18.) The parties refer to the UTMA Account after Schwab processed the application as the Joint Account. (8/4/2025 L. Marilley Aff. ¶ 19; Reqs. Admiss. ¶ 36.)[5]

21. Only two transfers into the Joint Account occurred after the purported conversion. (Reqs. Admiss. ¶¶ 37–39.) Both of those transfers—one for $7,600 on or around 16 September 2016 and another for $7,400 on or around 1 February 2017— were from the Original CollegeInvest Account that had been funded with UTMA funds. (Text Messages at Peter Marilley 0212; Original CollegeInvest Account Statement 1–4; Reqs. Admiss. ¶¶ 11–14, 36–40.)

---

[5] The record reflects repeated efforts by Mr. Marilley to exercise sole control over the Joint Account after the UTMA custodianship ended because Ms. Marilley refused to give him any of the CollegeInvest assets. (*See, e.g.*, 8/4/2025 L. Marilley Aff. ¶ 29; Text Messages at Peter Marilley 0197–0200.)

In June 2017, as discussed further below, Mr. Marilley blocked Ms. Marilley's access to and control of the funds in the Joint Account. (Text Messages at Peter Marilley 0197–0200; Cross-cl. & Answer Ex. F, ECF No. 4 [6/2017 Emails].) In September 2021, Mr. Marilley refused to lift the restrictions on the Joint Account because Ms. Marilley was "in receipt of CollegeInvest funds that belong[ed] to [Dr. Marilley]." (Text Messages at Peter Marilley 0201–02.) In July 2022, Mr. Marilley exerted his power over the Joint Account in an attempt to leverage Ms. Marilley's agreement to give him the money he demanded. (Text Messages at Peter Marilley 0202–17.)

According to Mr. Marilley, the purpose of converting the UTMA Account into the Joint Account (in both Mr. Marilley's and Ms. Marilley's names) was so that he would have access to the money and could recover what he deemed to be excess CollegeInvest funds gifted by Dr. Marilley to his granddaughter. (Am. Br. Opp. Mot. Summ. J. Ex. A ¶¶ 3–5, ECF No. 104.2 [10/1/2025 P. Marilley Aff.]; Mot. Summ. J. Ex. P, Interrogs. ¶ 19, ECF No. 74.5 [Interrogs.].) Mr. Marilley's Amended FINRA Claim admits his strategy. (Cross-cl. & Answer Ex. C, at 6, ECF No. 4 [FINRA Am. Claim] (alleging Mr. Marilley sought to restrict Joint Account "[b]ased upon [Ms. Marilley's] behavior in refusing to return [the approximately $147,000 remaining in the CollegeInvest Account] to her grandfather").)

22.    In December 2016, shortly after the purported account conversion, Mr. Marilley pressed his daughter to remove the UTMA designation from the Original CollegeInvest Account. (Mot. Summ. J. Ex. M, Ex. 1, at Peter Marilley 0075, ECF No. 74.2 [12/6/2016 Letter]; Mot. Summ. J. Ex. M, Ex. 1, at Peter Marilley 0076–81, ECF No. 74.2 [12/2016 UTMA Removal Form].) When Ms. Marilley asked why she needed to sign the forms Mr. Marilley presented to her, Mr. Marilley told her that the documents would "remove the UGMA [sic] assignment only[,]" because she "[was] no longer under 21 years of age." (Text Messages at Peter Marilley 0107–09.)

23.    Around 3 March 2017, Ms. Marilley opened a separate CollegeInvest Account in her own name (the Personal CollegeInvest Account). (Mot. Stay Arbitration Ex. K ¶¶ 5–8, ECF No. 15.2 [12/7/2023 L. Marilley Aff.]; Mot. Stay Arbitration Ex. J, ECF No. 15.1 [Personal CollegeInvest Account Statements].) She funded the Personal CollegeInvest Account with the $147,361.21 remaining in the Original CollegeInvest Account, (12/7/2023 L. Marilley Aff. ¶ 5; Personal CollegeInvest Account Statements) which, again, was money that originated with her grandfather's UTMA gift. (Text Messages at Peter Marilley 0212; Original CollegeInvest Account Statement 1–4; Reqs. Admiss. ¶¶ 11–14.)

24.    Then in April 2017, Mr. Marilley sent his daughter a form that would transfer her remaining CollegeInvest funds to Dr. Marilley and instructed her to execute it. (Mot. Summ. J. Ex. M, Ex 1, at Peter Marilley 0087, ECF No. 74.2 [4/18/2017 Letter]; Mot. Summ. J. Ex. M., Ex. 1, at Peter Marilley 0083–86, ECF No. 74.2 [4/2017 Account Information Change Form].) He repeated this attempt in December 2017

when he told her she was "required" to transfer the remaining CollegeInvest funds to Dr. Marilley. (Mot. Summ. J. Ex. M, Ex. 1, at Peter Marilley 0088, ECF No. 74.2 [12/29/2017 Letter].)

25. In the meantime, around 7 June 2017, after bickering with his daughter, Mr. Marilley instructed Schwab to place a "no funds out" restriction on the Joint Account. (6/2017 Emails (discussing "restrict[ion] of all trades and funds flow" "[a]s a result of [Mr. Marilley's] conversation last evening with" Schwab); L. Marilley Am. Cross-cl. ¶ 73; Answer L. Marilley Am. Cross-cl. ¶ 73.) When Ms. Marilley discovered the restriction, she made repeated, unsuccessful efforts to have the restriction lifted and Mr. Marilley removed from the Joint Account so that she alone had control of the funds. (*See, e.g.*, Text Messages at Peter Marilley 0197–0204; 8/4/2025 L. Marilley Aff. ¶¶ 24–29.)

26. While the funds in the Joint Account were restricted, Ms. Marilley worked as a nurse in Charlotte for two years before beginning graduate school in the fall of 2019. (8/4/2025 L. Marilley Aff. ¶ 30.) She spent the last of the funds in the Personal CollegeInvest Account on her graduate education in August 2021, a few months before she obtained her degree in January 2022. (8/4/2025 L. Marilley Aff. ¶ 31; 12/7/2023 L. Marilley Aff. ¶¶ 11, 14; Personal CollegeInvest Account Statements.) Ms. Marilley never transferred any funds from the Personal CollegeInvest Account to the Joint Account, (12/7/2023 L. Marilley Aff. ¶ 12; *see also* Reqs. Admiss. ¶ 45), which by then contained the last remaining UTMA funds, (*see* Reqs. Admiss. ¶¶ 20–27, 45).

27.     In May 2023, because of changes in Schwab's practices, Ms. Marilley was able to successfully transfer the remaining UTMA funds from the Joint Account to an account that she opened with Schwab in her name alone despite the restrictions Mr. Marilley had attempted to impose. (8/4/2025 L. Marilley Aff. ¶¶ 32–33.) After Mr. Marilley complained, Schwab restrained the assets in this account, which are now the subject of this suit.[6] (Compl. ¶ 10; 8/4/2025 L. Marilley Aff. ¶¶ 34–35.)

28.     Ms. Marilley maintains that she did not intend to give any of the Restrained Assets to Mr. Marilley, and he does not contend otherwise. (8/4/2025 L. Marilley Aff. ¶ 39; Interrogs. ¶ 16.) Moreover, Mr. Marilley admits (through his failure to timely respond) both that he was "not the source of any of the funds that are now the Restrained Assets" and that he has no "legal, equitable, or other interest in and/or to any of the Restrained Assets." (Reqs. Admiss. ¶¶ 45–46.)

## II.     PROCEDURAL HISTORY

29.     Schwab filed this interpleader action in September 2023, (Compl. 4, ECF No. 3), in response to Mr. Marilley's decision to file an arbitration action against both Schwab and Ms. Marilley in June 2023, (Compl. Ex. A, ECF No. 3 [FINRA Statement Claim].) Ms. Marilley moved to stay the arbitration to the extent it addressed ownership of the Restrained Assets. (Mot. Stay Arbitration 1–3, ECF No. 15.) The Court

---

[6] At the time, the Restrained Assets amounted to $287,615. (8/4/2025 L. Marilley Aff. ¶ 33.) Ms. Marilley testifies that the amount grew over time such that, as of August 2025, it exceeded $400,000. (8/4/2025 L. Marilley Aff. ¶ 43.)

agreed and enjoined Mr. Marilley from arbitrating ownership of the Restrained Assets. *Charles Schwab*, 2024 NCBC LEXIS 27, at \*19–20. Our Supreme Court affirmed. *Charles Schwab & Co., Inc. v. Marilley*, 387 N.C. 185 (2025) (per curiam).

30. Ms. Marilley subsequently moved for summary judgment on her declaratory judgment claim. (Mot. Summ. J. 1.) Because disposition of Ms. Marilley's Summary Judgment Motion had the potential to resolve the ownership issue, Schwab filed its Motion for Interpleader on 10 October 2025. (Mot. Interpleader 1.)

31. The Court noticed a hearing on the Summary Judgment Motion for 31 October 2025. (Notice Hr'g 1, ECF No. 122.) The day before the hearing, and more than two years after this lawsuit commenced, Mr. Marilley moved for leave to amend his Answer to Ms. Marilley's amended crossclaims to add the affirmative defenses of statute of limitations and laches, as well as a crossclaim for unjust enrichment. (Mot. Amend Answer 1.) The Court received full briefing on the Motions, held a hearing on the Summary Judgment Motion, and opts to rule on Mr. Marilley's Motion to Amend and Schwab's Motion for Interpleader without a hearing pursuant to Business Court Rule 7.4.

## III.    MS. MARILLEY'S MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

32. The Court must enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c); *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 186 (2019) (requiring summary judgment when "a

question of law arises based on undisputed facts" (quoting *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 334 (2015))).

33. "A genuine issue of material fact is one that can be maintained by substantial evidence." *Id.* at 186–87 (quoting *Ussery*, 368 N.C. at 335) (citation modified). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Id.* (quoting *Ussery*, 368 N.C. at 335) (citation modified).

34. "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *James H.Q. Davis Tr. v. JHD Props., LLC*, 387 N.C. 19, 23 (2025) (quoting *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002)). "If the movant successfully makes such a showing, the burden then shifts to the nonmovant to come forward with specific facts establishing the presence of a genuine factual dispute for trial." *Halikierra Cmty. Servs. LLC v. N.C. Dep't of Health & Hum. Servs.*, 385 N.C. 660, 663 (2024) (quoting *Pennington*, 356 N.C. at 579).

35. The Court "may not resolve issues of fact and must deny the motion if there is a genuine issue as to any material fact." *Forbis v. Neal*, 361 N.C. 519, 524 (2007) (citing *Singleton v. Stewart*, 280 N.C. 460, 464 (1972)). When deciding a summary judgment motion, the Court must consider the evidence in the light most favorable to the non-moving party. *Belmont Ass'n, Inc. v. Farwig*, 381 N.C. 306, 310 (2022) (quoting *Dalton v. Camp*, 353 N.C. 647, 651 (2001)).

**B.  Analysis**

36.  The Declaratory Judgment Act authorizes the Court "to declare rights, status, and other legal relations, whether or not further relief is or could be claimed[,]" N.C.G.S. § 1-253 (2026), "in any proceedings . . . in which a judgment or decree will terminate the controversy or remove an uncertainty[,]" N.C.G.S. § 1-256. The Act's "purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and it is to be liberally construed and administered." N.C.G.S. § 1-264.

37.  Ms. Marilley requests that the Court enter summary judgment declaring that she "is the sole and rightful owner to all the Restrained Assets." (L. Marilley Am. Cross-cl. ¶ 117.)

38.  Mr. Marilley argues that the Court should deny summary judgment because (1) Ms. Marilley's declaratory judgment claim is time-barred, and (2) genuine issues of material fact exist. (Am. Br. Opp. Mot. Summ. J. 1–2.) The Court first addresses Mr. Marilley's contentions.

**1.  The Statute of Limitations and Doctrine of Laches**

39.  The statute of limitations and the doctrine of laches are independent affirmative defenses that, if applicable, operate to bar a claim. *See Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 89 (2011) ("[L]aches are often a defense wholly independent of the statute of limitations." (quoting *Richmond Cedar Works v. John L. Roper Lumber Co.*, 168 N.C. 391, 395 (1915))). In this case, however, these defenses

are unavailable because they are affirmative defenses that must be raised in a responsive pleading, and Mr. Marilley failed to raise them in his Answer to Ms. Marilley's amended crossclaim as Rule 8(c) requires.

40.     It was Mr. Marilley's responsibility to plead these affirmative defenses if he intended to use them. N.C. R. Civ. P. 8(c). Not doing so has consequences. As our Supreme Court has observed, "[f]ailure to raise an affirmative defense in the pleadings generally results in a waiver thereof." *In re T.M.L.*, 377 N.C. 369, 381 (2021) (quoting *Robinson v. Powell*, 348 N.C. 562, 566 (1998)); *see also Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 178 (2003) ("When the statute of limitations is *properly pleaded* and the facts of the case are not disputed, resolution of the question becomes a matter of law and summary judgment may be appropriate." (emphasis added) (citation modified) (quoting *Marshburn v. Associated Indem. Corp.*, 84 N.C. App. 365, 369 (1987))); *Taylor v. City of Raleigh*, 290 N.C. 608, 622 (1976) (describing laches as "affirmative defense" that "*must be pleaded*" (emphasis added)); *Lawrence v. Lawrence*, 269 N.C. App. 414, 421 (2020) ("[Respondent's] first invocation of laches was asserted in his brief in support of his motions to dismiss and for summary judgment. As Respondent did not raise his affirmative defense in his first responsive pleading, he has waived the defense." (citing *Robinson*, 348 N.C. at 566)).[7]

---

[7] There are narrow exceptions that permit a party to present an affirmative defense for the first time at the summary judgment stage, none of which applies here. One such exception arises when "the parties agree to try the issue by express or implied consent." *News & Observer Publ'g Co. v. McCrory*, 251 N.C. App. 211, 219 (2016) (quoting *Burwell v. Giant Genie Corp.*, 115 N.C. App. 680, 684 (1994)). Far from expressly or impliedly consenting to the

41. Here, Mr. Marilley failed to plead either the statute of limitations or laches—both Rule 8(c) enumerated defenses—in his Answer to Ms. Marilley's amended crossclaims. Instead, after more than twelve months of litigation, he attempts to raise these affirmative defenses for the first time in a brief in opposition to Ms. Marilley's Summary Judgment Motion. Pursuant to Rule 8(c), and in accordance with the holdings in the cases cited above, Mr. Marilley has waived these affirmative defenses. Even if this were not true, neither the statute of limitations nor the doctrine of laches forecloses summary judgment in this case.

### a.    Statute of Limitations

42. To determine the applicable statute of limitations to apply to a declaratory judgment claim, the Court must first determine "the substantive right that is most closely associated with the declaration that is being sought." *Chisum v. Campagna*, 376 N.C. 680, 719 (2021).

43. Mr. Marilley argues that the underlying claim sounds in contract and that the Account Agreement determines ownership of the Restrained Assets. (Am. Br. Opp. Mot. Summ. J. 9–11.) He also argues that the Account Agreement's choice-of-law provision dictates that Nebraska law controls. (Am. Br. Opp. Mot. Summ. J. 14–16; *see also* Compl. Ex. B, ECF No. 3 [Account Agreement].)

---

Court's consideration of these defenses, Ms. Marilley argues that the Court should reject them. (Reply Br. Supp. Mot. Summ. J. 5–8, ECF No. 120.)

Another exception applies when the affirmative defense is "raised for the first time in a motion for summary judgment[,]" but the motion "must ordinarily refer expressly to the affirmative defense relied upon." *Cnty. of Rutherford ex rel. Child Support Enf't Agency v. Whitener*, 100 N.C. App. 70, 74 (1990) (quoting *Dickens v. Puryear*, 302 N.C. 437, 443 (1981)). This exception does not extend to a situation, true here, where a party attempts to raise an unpleaded affirmative defense in a *brief opposing* a motion for summary judgment.

44.     Ms. Marilley disagrees.  She argues this Court has already determined that the Account Agreement does not govern ownership of the Restrained Assets. (Reply Br. Supp. Mot. Summ. J. 5–6.)  Instead, Ms. Marilley contends, this is a dispute regarding the ownership of personal property that is governed by the UTMA. (Reply Br. Supp. Mot. Summ. J. 5–6.)

45.     The Court agrees with Ms. Marilley that it has already determined that, as between Ms. Marilley and Mr. Marilley, ownership of the Restrained Assets does not arise out of or relate to the Account Agreement.[8]  Accordingly, Ms. Marilley's declaratory judgment claim does not sound in contract, and the choice-of-law provision in that Account Agreement has no application.  Rather, the Court looks to New York and Florida's codifications of the UTMA, as well as applicable North Carolina law, to decide this declaratory judgment claim.

46.     Mr. Marilley argues that Ms. Marilley erroneously relies on Florida's version of the UTMA (the FUTMA) because neither she nor Dr. Marilley was a Florida resident at the time of the initial 2005 transfer.  (Am. Br. Opp. Mot. Summ. J. 16–17.)  He takes this position even though he caused the law applicable to the UTMA Account to be changed from New York to Florida when he began serving as custodian. (Am. Br. Opp. Mot. Summ. J. 16–17.)  Mr. Marilley asserts that the law of one of Dr. Marilley's or Ms. Marilley's then-states of residence, either Colorado or New York,

---

[8] This Court previously held, and our Supreme Court affirmed, that ownership of the Restrained Assets as between the Marilleys did not arise out of or relate to the Account Agreement. *Charles Schwab*, 2024 NCBC LEXIS 27, at *14–15.

must apply, and that Ms. Marilley's reliance on Florida law defeats summary judgment. (Am. Br. Opp. Mot. Summ. J. 16–17.)

47.    But the Uniform Transfers to Minors Acts in both New York and Colorado are consistent with Florida law with respect to the relevant provisions, and Mr. Marilley has identified no conflict among them. *Compare* Fla. Stat. §§ 710.101–126 (2026), *with* Colo. Rev. Stat. §§ 11-50-101 to -126 (2026), *and* N.Y. Est. Powers & Trusts Law §§ 7-6.1 to -6.26 (2026). This is not surprising given that these states adopted the Uniform Act. Consequently, regardless of which state's version of the UTMA applies, the result is the same.[9]

48.    Finally, Mr. Marilley traces his ownership interest in the Restrained Assets to the purported conversion of the UTMA Account to the Joint Account in 2016, while the funds were in North Carolina. (Am. Br. Opp. Mot. Summ. J. 15–16 (referring to "creation of the Joint Account" as "the original conveyance" that "contradicts

---

[9] The UTMA Account initially stated that Dr. Marilley was the UTMA custodian for Ms. Marilley under the New York UTMA. (UTMA Account Statements 1.) Sometime in late 2009 or early 2010, around the time Mr. Marilley took over as custodian from Dr. Marilley, the UTMA Account was changed to Florida law. (UTMA Account Statements 1–3.)

Under the UTMA, delivery of funds into an account identified with a state is a UTMA transfer governed by the law of that state. *E.g.*, N.Y. Est. Powers & Trusts Law §§ 7-6.2(a) (applying New York UTMA to transfers that name New York law), 7-6.9(a)(1)–(2) (prescribing form of transfer that invokes New York UTMA to effect New York UTMA transfer); Fla. Stat. §§ 710.103(1), .111(1)(a)–(b) (same for Florida); *see also* Unif. Transfers to Minors Act § 2 cmt. (Unif. L. Comm'n 1986) ("The creation of a custodianship must invoke the law of a particular state because of the form of the transfer required under SECTION 9(a) . . . . This Act continues to govern . . . despite subsequent relocation of the parties or the property.").

Therefore, either New York or Florida law governs all the UTMA transfers in this case, with the particular transfer depending on when it occurred. The law that applied at the time of the transfer followed the assets until Ms. Marilley reached the age of twenty-one. Because the law of the states involved is the same, for simplicity, the Court refers herein to the FUTMA, Florida's codification of the UTMA, with respect to the funds at issue.

[Ms. Marilley]'s contention that she is 'sole and rightful owner to all the Restrained Assets'").) Any effect of this supposed conversion would be governed by North Carolina law. *See Ellison v. Hunsinger*, 237 N.C. 619, 624 (1953) (holding law of situs of personal property governs interests in personal property); *accord* Restatement (First) of Conflict of Laws § 258 (A.L.I. 1934) ("The nature and characteristics of an interest created by a conveyance of an interest in a chattel is determined by the law of the place where the chattel is at the time of the conveyance.").

### i. Determining the Nature of the Underlying Claim for Relief for Statute of Limitations Purposes

49.    Mr. Marilley contends the underlying claim for relief is contractual. (Am. Br. Opp. Mot. Summ. J. 9–10.) If he is right, then North Carolina's three-year statute of limitations applies. *See* N.C.G.S. § 1-52(1); *Chisum*, 376 N.C. at 717 (discussing three-year statute of limitations applicable to declaratory judgment claims based on contract). Ms. Marilley rejects that characterization and argues that the controversy centers on "ownership of the Restrained Assets[,]" which is grounded in the statutory scheme of the UTMA, and thus the statute of limitations does not bar this claim. (Reply Br. Supp. Mot. Summ. J. 6–7.) According to her, Mr. Marilley's view of the applicable statute of limitations would prevent resolution of an ongoing dispute, which cannot be the case. (Reply Br. Supp. Mot. Summ. J. 7–8.) The Court agrees with Ms. Marilley.

50.    Mr. Marilley is correct that the underlying theory of relief in a suit to declare ownership of property can be contractual. *See Walter v. Walter*, 275 N.C. App. 956, 966 (2020). In *Walter*, for example, title to real property was uncertain because

of a claim that the power of attorney empowering the agent who deeded the land did not authorize the transfer. *Id.* Because the source of the controversy was the scope of the power of attorney, the court characterized the underlying claim for relief as contractual. *Id.*

51.     In *Penley v. Penley*, the two parties orally agreed "to have an equal number of shares of stock issued" to each of them. 314 N.C. 1, 20 (1985). When the defendant failed to perform (by not issuing the shares as agreed), the plaintiff sought a declaration of his entitlement to his share of the later-formed corporation under the contract. *Id.* Our Supreme Court characterized this as a contract dispute and applied the corresponding three-year statute of limitations. *Id.* at 20–21.

52.     In *Chisum*, the plaintiff sought a declaration that he was a member of a limited liability company after the defendants allegedly interfered with his interest in it. 376 N.C. at 719. The Court classified the underlying claim there as a contract dispute because it turned on "the contents of the operating agreement associated with [the LLC], which [was], of course, a contract." *Id.*

53.     However, North Carolina courts are also called upon to declare ownership of personal property when an adverse claim casts a cloud on the possessor's title. *See Newman Mach. Co., Inc. v. Newman*, 275 N.C. 189, 195–96 (1969). In *Newman*, our Supreme Court recognized a cause of action, under the courts' equitable powers, "to remove cloud and quiet title to personalty[.]" *Id.* at 195. The Court discussed the "old equity practice" of quieting title to realty or personalty that permitted the courts to "prevent future litigation, by removing existing causes which might affect the

plaintiff's title." *Id.* Such a plaintiff, "[b]eing in possession, . . . could not sue at law, and the adverse claimant would not sue, . . . or at any rate the existence of such claim cast a cloud upon his title which would affect its value." *Id.* The Court noted that the statutory codification for quieting title to real property supplanted that equity practice, but it remained viable for personal property, which the statute did not address. *Id.* at 196.

54. In that case, the defendant, George Newman, was an employee, director, and the majority shareholder of Newman Machine Company. *Id.* at 190. He sold his shares back to the company and agreed to a several-year employment agreement. *Id.* at 191. He later contended the company grossly underpaid him for his shares and began sending demand letters in which he claimed an interest in some of the shares the company bought from him. *Id.* at 192. The company sued for a declaration that the shares belonged to it and not Newman. *Id.* at 194.

55. In discussing the theory of relief underlying the plaintiff's suit, the Court noted past cases in which the relief sought was purely to clear a cloud on the title. *Id.* at 196–97. Circumstances fitting the cloud-of-title pattern included when the cloud arose from (1) a void recorded chattel mortgage; (2) when some, but not all, outstanding municipal bonds were void for lack of purchase consideration but the bondholders did not know which specific bonds were deficient; (3) when a purchaser of stock sought to establish its title as against the seller; and (4) when a defendant out of possession claimed to own the plaintiff's bonds. *Id.* Thus, the underlying the-

ory of relief is one to clear title when, as here, the party-in-possession seeks a declaration of superior ownership in property as against another party making adverse claims to an interest in the property.

56.     When a plaintiff's request for relief matches that pattern, no statute of limitations applies because "such an action is a continuing right which exists as long as there is an occasion for its exercise." *Poore v. Swan Quarter Farms, Inc.*, 79 N.C. App. 286, 290 (1986) (citation modified).  This holding is intuitive, as well as consistent with our Supreme Court's treatment of the continuing-wrong doctrine in other contexts.  Under the continuing-wrong doctrine, "the applicable limitations period starts anew" each time an action giving rise to a claim occurs.  *Quality Built Homes Inc. v. Town of Carthage*, 371 N.C. 60, 70 (2018).  The Court called a defendant's repeated trespass onto the plaintiff's property the "classic example" of this doctrine and distinguished it from a one-time wrong that later produces an ill effect.  *Id.*; *accord Williams*, 357 N.C. 170 at 179 (distinguishing "continual unlawful acts" that restart limitations period from "continual ill effects from an original violation" that do not (quoting *Ward v. Caulk*, 650 F. 2d 1144, 1147 (9th Cir. 1981)).

57.     This pattern matches the circumstances here.  Mr. Marilley's continual claims to the Restrained Assets—before arbitration panels, to Schwab, and elsewhere—cast a cloud on his daughter's claim of ownership.  A declaration of ownership will eliminate that uncertainty and dispense with the controversy over the Restrained Assets.

58.     In addition, in this case, Ms. Marilley alleges that her father breached a fiduciary duty that he owed her in order to benefit himself.  This is the essence of constructive fraud, which "arises where a confidential or fiduciary relationship exists which has led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Forbis*, 361 N.C. at 528 (citation modified).  The statute of limitations for constructive fraud is ten years.  *Chisum*, 376 N.C. at 707 (citing N.C.G.S. § 1-56(a)).

59.     In *Honeycutt v. Weaver*, the decedent's son sought a declaration that his sister (the decedent's attorney-in-fact) had conveyed her mother's real property to herself in a breach of fiduciary duty rising to the level of constructive fraud.  257 N.C. App. 599, 606 (2018).  The son argued that the deed was void on that basis.  *Id.*  The court applied the ten-year statute of limitations without specifying whether section 1-47 (applicable to actions on instruments conveying real property) or section 1-56 (the residual, catch-all statute of limitations arising in constructive fraud claims) applied.  *Id.* at 604, 606.[10]

---

[10] The plaintiff in *Chisum* unsuccessfully argued that the Court should apply the statute of limitations applicable to constructive fraud claims.  376 N.C. at 719.  There, the plaintiff alleged that the defendants were "freez[ing] him out of the LLCS, conduct[ing] sham capital calls, act[ing] as if he was no longer a member of the LLCs, and treat[ing] him in a manner that was inconsistent with his status as a member[.]"  *Id.* at 724 (citation modified).  The Court classified the declaratory judgment claims as contract claims, not constructive fraud claims, because they "*ultimately* hinge[d] upon the validity of his claim" that he was a member of the LLCs and his rights under the applicable operating agreements.  *Id.* at 719 (emphasis added).  The Court determined that the analogous statute of limitations was one for breach of contract because that claim logically preceded the constructive fraud claim.  *See id.*  The same is not true here.

60. Here, the underlying claim does not sound in contract. Instead, Ms. Marilley complains that her father (and fiduciary) acted contrary to her interests to benefit himself. Unlike *Chisum*, her allegations do not reach "ultimate[ ]" resolution by resort to a contract.[11]

61. For these reasons, the Court concludes that the proper characterization of Ms. Marilley's claim, as alleged by her, is either one to clear title or one for constructive fraud. *See Chisum*, 376 N.C. at 719 (crediting, in classification analysis, plaintiff's framing of underlying theory of relief); *Ramsey v. Ramsey*, 224 N.C. 110, 113–14 (1944) (looking to plaintiff's pleading and evidence to ascertain underlying theory of relief). Regardless of which of these theories is more analogous, the statute of limitations does not bar her claim.

**b.  Doctrine of Laches**

62. Mr. Marilley raises the doctrine of laches in passing and makes no arguments addressed to its elements. Nor does Ms. Marilley address laches in her reply. Nonetheless, the Court addresses the defense for the sake of completeness.

63. The party asserting laches—here, Mr. Marilley—bears the burden of proving that affirmative defense. *Stratton*, 211 N.C. App. at 89 (citing *Taylor*, 290 N.C. at 622). There are three elements. The first is "a delay of time . . . result[ing] in some change in the condition of the property or in the relations of the parties."

---

[11] Ms. Marilley does not point to the Account Agreement or any other contract as a basis for the uncertainty of ownership that currently surrounds her claim to the Restrained Assets. Indeed, she disclaims any reliance on contract as a theory of relief. (*See* L. Marilley Am. Cross-cl. ¶ 116 ("[T]he conversion of the UTMA Account to a joint account did not change the nature of the Restrained Assets[.]").)

*Abbott v. Abernathy*, 287 N.C. App. 522, 529–30 (2023) (quoting *Johnson v. N.C. Dep't of Cultural Res.*, 223 N.C. App. 47, 55 (2012)). Second, Mr. Marilley must show that delay was "unreasonable and . . . worked to [his] disadvantage, injury or prejudice[.]" *Id.* at 530 (quoting *Johnson*, 223 N.C. App. at 55). Finally, he must establish that Ms. Marilley "knew of the existence of the grounds for the claim." *Id.* (quoting *Johnson*, 223 N.C. App. at 55).

64. Here, Mr. Marilley points to no pertinent change in the condition of the Restrained Assets or in the relationship of the parties that has occurred with the passage of time. To the contrary, Charles Schwab's restraint of the assets has served to protect the *status quo* since then.

65. Nor can Mr. Marilley demonstrate any unreasonable delay that worked to his prejudice. "The prejudice element of the laches doctrine refers to whether a defendant has been prejudiced in its ability to defend against the plaintiff's claims by the plaintiff's delay in filing suit." *Id.* (citation modified) (quoting *Johnson*, 223 N.C. App. at 56). The "mere passage of time" is insufficient; the delay must have been "unreasonable under the circumstances." *Holland v. Holland*, 919 S.E. 2d 258, 262 (N.C. Ct. App. 2025) (citing *Myers v. Myers*, 213 N.C. App. 171, 179 (2011)).

66. Mr. Marilley filed an arbitration claim to determine ownership of the Restrained Assets, prompting Schwab to file this interpleader action. Ms. Marilley then crossclaimed against Mr. Marilley and asserted that she was the sole owner of the funds. The Court discerns no prejudice to Mr. Marilley in permitting adjudication

in this Court of an issue that he first raised. Therefore, the timing of Ms. Marilley's crossclaim was not "unreasonable under the circumstances."

67. Accordingly, the doctrine of laches does not bar Ms. Marilley's declaratory judgment claim.

## 2. Ownership of the Restrained Assets

68. Ms. Marilley contends that the undisputed facts entitle her to a judgment declaring that she alone owns the Restrained Assets. (L. Marilley Am. Crosscl. ¶ 117; Br. Supp. Mot. Summ. J. 26–28, ECF No. 75.) The Court agrees.

69. The FUTMA provides for irrevocable transfers to a single custodian for the benefit of a single minor. Fla. Stat. §§ 710.111–.113;[12] *see also* Sarah Moore Johnson, 53 *U. Miami L. Ctr. on Est. Planning* ¶ 903.2(D) ("The only limitation [on creation of FUTMA custodial property] is that the transfer must be irrevocable."). A transfer of money to a brokerage account held for a minor's benefit under the FUTMA creates custodial property. Fla. Stat. § 710.111(b). Furthermore, "custodial property is created and a transfer is made whenever . . . money is paid or delivered to a broker or financial institution for credit to an account in the name of . . . an adult other than the transferor . . . followed in substance by the words 'as custodian for (<u>name of minor</u>) under the Florida Uniform Transfers to Minors Act[.]'" Fla. Stat. § 710.111(1)(b) (citation modified).

---

[12] As stated above, the FUTMA and the UTMAs in both New York and Colorado are consistent with respect to the relevant provisions. *Compare* Fla. Stat. §§ 710.101–126, *with* Colo. Rev. Stat. §§ 11-50-101 to -126, *and* N.Y. Est. Powers & Trusts Law §§ 7-6.1 to -6.26.

70. The custodial property is indefeasibly vested in the minor, but the custodian retains control over the custodial property until the minor reaches the age of majority, in this case twenty-one. Fla. Stat. §§ 710.113(2) (discussing vesting, rights, and powers concerning custodial property), .102(12) (defining "[m]inor" for FUTMA purposes as person under twenty-one). While the custodian controls the funds, the FUTMA imposes a fiduciary duty on him. Fla. Stat. §§ 710.114–.115. But once the minor turns twenty-one, the custodianship terminates, and the custodian must transfer the funds to the minor. Fla. Stat. § 710.123(1)(a).

71. The Restrained Assets are funds that were irrevocably gifted to Ms. Marilley as custodial property. The initial gift from Dr. Marilley to Ms. Marilley created the UTMA Account. Dr. Marilley later exercised his power as custodian to transfer some of those funds to the then-newly opened Original CollegeInvest Account, but even after this transfer, the funds retained their status as an irrevocable gift until Ms. Marilley turned twenty-one.[13] In accordance with the UTMA, the funds were indefeasibly vested in Ms. Marilley subject to the custodian's control as her fiduciary.

72. Likewise, additional funds transferred into the UTMA Account over the years were also irrevocably gifted to Ms. Marilley, the minor. Specifically, the

---

[13] *See also The Schwab 529 Education Savings Plan*, Charles Schwab & Co., Inc. (Nov. 17, 2025), https://www.schwab.com/529-plan ("You may be able to transfer all or part of a custodial account to the Schwab 529 College Savings Plan if you are the custodian for a . . . Uniform Transfers to Minors Act . . . account. . . . *Because custodial assets are irrevocable gifts, the minor will be the 529 account owner and beneficiary, and you will be the responsible individual on the account. When the minor reaches legal adulthood . . . the minor will have full control of the account.*" (emphasis added)).

$74,000 check Dr. Marilley wrote from the Marilley Family Limited Partnership became irrevocably gifted custodial property when it was delivered to the UTMA Account in the name of Mr. Marilley as custodian for Ms. Marilley under the FUTMA. (UTMA Conversion Appl. 1 (showing UTMA Account title in 2016 as "Peter Joseph Marilley Custodian Lauren Elizabeth Marilley UNIF Tran"); Reqs. Admiss. ¶¶ 8, 23, 27.) Once she turned twenty-one in August 2016, the custodian of the UTMA Account, which by then was her father, Mr. Marilley, was required to turn over control of the funds to Ms. Marilley.

73. Ms. Marilley maintains that she never gave any of the funds that constitute the Restrained Assets to Mr. Marilley. (8/4/2025 L. Marilley Aff. ¶ 39.) Likewise, Mr. Marilley does not contend that his daughter gave him any of the money at issue. (Interrogs. ¶ 16.) Instead, Mr. Marilley argues (at times inconsistently with his deemed admissions) that Ms. Marilley's signature on the form to convert the UTMA Account to a Joint Account resulted in his having an ownership interest in the Restrained Assets, precluding summary judgment in Ms. Marilley's favor. (Am. Br. Opp. Mot. Summ. J. 16.)

74. The Court disagrees. Ms. Marilley had not yet reached the age of majority, twenty-one years, when she signed the form, supplied by her father without consideration, to convert the UTMA Account to the Joint Account. Consequently, she was unable, as a matter of law, to convey ownership to her father of funds that were indefeasibly vested in her.

75.     Mr. Marilley argues that the age of majority to contract, which is eighteen, *see* N.C.G.S. § 48A-2, should control whether Ms. Marilley was able to convey the funds.  Again, the Court disagrees.  Ms. Marilley may have been of age to contract regarding certain matters, but she was powerless to affect ownership of custodial funds in a UTMA account.  *See* Fla. Stat. § 710.113(2) ("[T]he custodial property is indefeasibly vested in the minor, but the custodian has all the rights, powers, duties, and authority provided in this act, and *neither the minor nor the minor's legal representative has any right, power, duty, or authority with respect to the custodial property* except as provided in this act." (emphasis added)).  Any attempt by her to transfer funds to Mr. Marilley before she reached age twenty-one would have been ineffective. *Cf. Walston v. Atl. Christian Coll. (Inc.)*, 258 N.C. 130, 133–35 (1962) (holding attempted transfer of property by grantor with no right or power of ownership over property "was ineffective to convey title"); *Hinman v. Cornett*, 290 N.C. App. 30, 37–38 (2023) (holding attempted transferor "could not transfer" property she did not own because "no one can transfer a better title than he himself possesses" (quoting *Miller v. Tharel*, 75 N.C. 148, 152 (1876)).  Thus, any purported transfer to Mr. Marilley was ineffective because Ms. Marilley lacked any "right, power, duty or authority with respect to the custodial property."  Fla. Stat. § 710.113(2); *see* Fla. Stat. § 710.115(1) ("A custodian, acting in a custodial capacity, has *all the rights, powers, and authority over the custodial property that unmarried adult owners have over their own property*[.]" (emphasis added)).

76. All the other arguments Mr. Marilley raises to defeat summary judgment on this central issue fail. (*See* Am. Br. Opp. Mot. Summ. J. 13–14.) He attempts to rely on his affidavit to contradict binding—and dispositive—admissions, which cannot succeed. *Stocks*, 378 N.C. at 350 ("A party's own affidavit opposing summary judgment does not overcome the conclusive effect of that party's previous admissions." (quoting *Rhoads*, 56 N.C. App. at 637) (citation modified)). He also seeks to avoid the governing law because it is unfavorable to his position. None of this satisfies Mr. Marilley's burden to show that a genuine issue of material fact exists.

77. For these reasons, the Court concludes as a matter of law that it is Ms. Marilley, and not Mr. Marilley, who owns the Restrained Assets.

## IV. MR. MARILLEY'S MOTION FOR LEAVE TO AMEND HIS ANSWER TO MS. MARILLEY'S AMENDED CROSSCLAIMS

78. Mr. Marilley, pursuant to Rules 13(g) and 15(a), seeks to amend his answer to add a crossclaim for unjust enrichment and the time-bar affirmative defenses discussed above. (Mot. Amend Answer 1; Br. Supp. Mot. Amend 1, ECF No. 132.) Both Schwab and Ms. Marilley oppose Mr. Marilley's request. (Mot. Amend Answer 1.)

79. Mr. Marilley's theory of unjust enrichment is that Ms. Marilley improperly retained at least some of the funds Dr. Marilley provided to her. (Mot. Amend Answer Ex. 1 ¶¶ 45–52, ECF No. 131 [P. Marilley Cross-cl.].) He argues that Dr. Marilley intended to fund only her undergraduate education and any amount she received in excess of what was necessary for her undergraduate education was given to her in error. (P. Marilley Cross-cl. ¶¶ 22, 48–50.) He alleges that Dr. Marilley

intended for Ms. Marilley to return any funds not needed for her undergraduate education by transferring the money to other 529 accounts Dr. Marilley controlled for the benefit of other family members. (P. Marilley Cross-cl. ¶ 22.) These relatives included Dr. Marilley's other grandchildren, grandnieces, and a step-grandson-in-law. (P. Marilley Cross-cl. ¶ 22.)

80. Mr. Marilley alleges not only that Dr. Marilley *intended* for Ms. Marilley to return excess funds but also that she acknowledged and *agreed* to return any funds not needed for her undergraduate education to her grandfather "for redeposit into the grandchildren's 529 Plan accounts." (P. Marilley Cross-cl. ¶¶ 24–27.)

81. The proposed claim involves the two accounts discussed above: (1) the UTMA Account Dr. Marilley originally funded, which was an irrevocable gift to Ms. Marilley as a matter of law, and (2) the Original CollegeInvest Account that benefitted Ms. Marilley, which Dr. Marilley funded with UTMA funds. At various times, Mr. Marilley has attempted to claw back funds from *both* of these accounts to remedy the same alleged wrong, as his proposed crossclaim details.

82. Mr. Marilley claims that he identified the issue of excess funds with Ms. Marilley in 2016 "before she had finished her undergraduate degree." (P. Marilley Cross-cl. ¶ 26.) He says that both he and Dr. Marilley informed Ms. Marilley that keeping the "trust funds" for herself could have adverse financial and legal consequences and that Dr. Marilley's intention was that any "balance should go back to the grandchildren's education fund." (P. Marilley Cross-cl. ¶¶ 27, 30.)

83. To that end, before she completed her undergraduate degree, Mr. Marilley instructed Ms. Marilley to sign the UTMA Conversion Application purporting to convert the *UTMA Account*—not the Original CollegeInvest Account—into the Joint Account owned by both Ms. Marilley and Mr. Marilley personally. Notably, he did not instruct her to return the funds to Dr. Marilley or to any college savings plan. (P. Marilley Cross-cl. ¶¶ 27, 30.)

84. In addition, Mr. Marilley claims that after Ms. Marilley received her undergraduate degree in 2017, he asked her to return the approximately $147,000 remaining in her Original CollegeInvest Account to other 529 plans. (P. Marilley Cross-cl. ¶ 34.) In support of that proposition, Mr. Marilley cites correspondence he exchanged with CollegeInvest in mid-2018 describing steps Ms. Marilley could take to "transfer ownership of the funds back to [Dr. Marilley]." (P. Marilley Cross-cl. ¶ 35; Mot. Amend Answer Ex. 1, Ex. I at 1, ECF No. 131 [2018 CollegeInvest Letter].)

85. At bottom, Mr. Marilley seeks the $147,000 that remained in the Original CollegeInvest Account when Ms. Marilley finished her undergraduate degree in 2017. (P. Marilley Cross-cl. ¶ 55.) He alleges that he does so in his capacity as "Successor" to the Original CollegeInvest Account. (P. Marilley Cross-cl. ¶¶ 1–2.)

86. Mr. Marilley argues that denying him leave to add his crossclaim would unduly prejudice him. (Br. Supp. Mot. Amend 11.) He argues that both he and Ms. Marilley have been on notice of his theory of recovery for months now and that, unless he is permitted to amend, he will be prevented from bringing this claim. (Br. Supp. Mot. Amend 11–12.) Finally, he says that amendment is appropriate because it is

based on facts already in the record and because discovery in the case had not closed when he filed his Motion to Amend. (Br. Supp. Mot. Amend 12.)

87. Ms. Marilley responds that permitting the proposed amendment would be futile, comes too late, is the product of bad faith, and would unduly prejudice her. (Br. Opp. Mot. Amend 1.)

### A. Legal Standard

88. Rule 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." N.C. R. Civ. P. 15(a). "When justice so requires" is among the most liberal standards in all the Rules. *Vaughan v. Mashburn*, 371 N.C. 428, 434 (2018) (citing Wilson, *North Carolina Civil Procedure*, § 15-3).

89. Nevertheless, the liberal standard for amendment has limitations, including whether the amendment would result in material prejudice to the opposing party. *See, e.g.*, *Vaughan*, 371 N.C. at 433 ("[A]mendments should be freely allowed unless some material prejudice to the other party is demonstrated." (quoting *Mauney v. Morris*, 316 N.C. 67, 72 (1986))). The party opposing amendment bears the burden to show material prejudice. *Id.* at 433–34 (quoting *Mauney*, 316 N.C. at 72). Whether undue prejudice exists is ultimately a matter for the Court's discretion. *Id.* at 433 (quoting *Henry v. Deen*, 310 N.C. 75, 82 (1984)).

90. Futility is another well-established basis to deny a motion to amend. *See, e.g.*, *Smith v. McRary*, 306 N.C. 664, 671 (1982). As discussed above, the proposed amendment to add time-bar affirmative defenses shall be denied as futile if the proposed defenses would not affect the outcome of the case. *See Lee v. Keck*, 68 N.C.

App. 320, 326–27 (1984) (affirming denial of leave to amend to add statute-of-limitations defense when defendants did not show amendment would lead to different outcome). Similarly, when a proposed new claim for relief would fail as a matter of law, the Court is justified in denying the amendment on futility grounds. *See City of Winston-Salem v. Yarbrough*, 117 N.C. App. 340, 347–48 (1994) (citing *Smith*, 306 N.C. at 666) (affirming denial of leave to amend to add counterclaims when new claim would fail as matter of law).

**B.    Analysis**

91.    Mr. Marilley's proposed amendment shall be denied as futile because the crossclaim and defenses he seeks to add all fail as a matter of law. The Court also concludes Mr. Marilley's motion comes too late.

92.    The Court has already analyzed the merits of Mr. Marilley's time-bar arguments (for both statute of limitations and laches) above and determined that they fail as a matter of law. For the same reasons, amendment to add those affirmative defenses would be futile.

93.    The proposed crossclaim for unjust enrichment fares no better. A viable claim for unjust enrichment requires Mr. Marilley to show that (a) *he* (not Dr. Marilley) conferred a benefit on his daughter and (b) the benefit was not gratuitous. *Krawiec v. Manly*, 370 N.C. 602, 615 (2018) (citing *Booe v. Shadrick*, 322 N.C. 567, 570 (1988)). Finally, an unjust enrichment claim "is not based on a promise." *Booe*, 322 N.C. at 570. Indeed, "if there is a contract between the parties the contract governs the claim and the law will not imply a contract." *Id.* (citation modified) (citing *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 714 (1962)).

94. The proposed crossclaim is not viable because the undisputed facts show (1) the funds were an irrevocable gift from Dr. Marilley to Ms. Marilley under the UTMA as a matter of law, (2) Mr. Marilley is not a proper party to bring this claim, and (3) any alleged promise Ms. Marilley may have made to return the funds raises questions of contract, not implied contract.

95. The record establishes, contrary to the proposed amendment, that Mr. Marilley was not the source of any of the funds at issue. Consequently, he did not confer the benefit of the CollegeInvest funds on Ms. Marilley. (P. Marilley Cross-cl. ¶¶ 19–22; Reqs. Admiss. ¶¶ 10–14, 23–25, 28, 45.)

96. Nor are his attempts to sidestep this issue by bringing the claim "in his capacity as Successor under the 529 Plan established by Dr. Marilley" availing. (P. Marilley Cross-cl. ¶ 55.) Dr. Marilley conferred the benefit of the funds Mr. Marilley seeks to recover (i.e., the excess of CollegeInvest funds over the amount required to fund Ms. Marilley's undergraduate education) under the UTMA before any money was transferred to the Original CollegeInvest Account. The fact that Mr. Marilley claims to now be the "Successor" to that account is of no consequence:

> When property is transferred to a 529 college savings plan from an UTMA account, the 529 account must be set up as a custodial 529 college savings plan account, as opposed to a regular 529 plan account. The custodial 529 plan will be titled in the same way as the UTMA account. The custodian will be prohibited from changing the beneficiary of the custodial 529 plan. When the child reaches the age of majority under

the state's UTMA, the child will automatically become the owner of the 529 plan.

Johnson, *supra*, § 903.4(C). Like the rest of Mr. Marilley's various theories, this attempt fails to grasp that the assets and accounts subject to the UTMA were irrevocable gifts in favor of Ms. Marilley. Even Dr. Marilley, who provided the gift, cannot retrieve it. Neither can Mr. Marilley as his alleged successor.

97. Mr. Marilley's attempts to show that Ms. Marilley "agreed to facilitate return of the excess" CollegeInvest funds only undermine his claim for unjust enrichment. (P. Marilley Cross-cl. ¶ 27.) Any promise by Ms. Marilley concerning the funds at issue would raise contract issues, foreclosing a claim for unjust enrichment. *See Booe*, 322 N.C. at 570 (citing *Vetco Concrete*, 256 N.C. at 714) (holding existence of contract precludes unjust enrichment claim).

98. In addition, Mr. Marilley unduly delayed filing a motion to amend. Since the appeal was completed and this Court lifted the appellate stay, Mr. Marilley has filed numerous motions and papers, (*e.g.*, ECF Nos. 54–56, 69, 72, 88–90, 92–93), but a motion to amend was not among them. As he admits, (Reply Br. Supp. Mot. Amend 3–4, ECF No. 154), Mr. Marilley could have pleaded his status as "Successor" when he answered Ms. Marilley's amended crossclaims almost a year after Dr. Marilley became incapacitated, but he failed to do so. Instead, Mr. Marilley waited to move to amend his pleading until the afternoon before the hearing on Ms. Marilley's Summary Judgment Motion, (ECF No. 131). His attempt comes too late.

99. Because the amendment Mr. Marilley proposes would be both futile and was filed too late, the Court, in its discretion, **DENIES** the Motion to Amend.

## V.       SCHWAB'S MOTION FOR INTERPLEADER, DISCHARGE, AND DISMISSAL

100.    Schwab moves, pursuant to Rule 22, for the Court to order removal of the restrictions on the Restrained Assets, discharge it of liability to either defendant respecting the Restrained Assets, and dismiss it from this case.

101.    Rule 22, interpleader, is a procedural mechanism by which plaintiffs in possession of disputed assets may require the contenders to litigate their adverse claims before the Court.  *See* N.C. R. Civ. P. 22(a).

102.    Interpleader proceeds in two steps.  First, the Court determines whether interpleader is appropriate because the plaintiff faces "claims [that] expose or may expose the plaintiff to double or multiple liability."  *Id.*; Wilson, *North Carolina Civil Procedure* § 22-3 ("In the first stage, the court must find whether plaintiff is entitled to interplead the various defendants.").  If so, the Court dismisses the plaintiff, *see Barden v. Metro. Life Ins. Co.*, 41 N.C. App. 135, 136 (1979) (discussing trial court's dismissal of interpleader plaintiff), and discharges it of liability for the disputed assets, *United States v. Harrison*, 49 N.C. App. 200, 202 (1980) (discussing discharge of interpleader plaintiff's liability for disputed assets).  *See also* Wilson, *North Carolina Civil Procedure* § 22-3 ("Once an order of discharge has been entered, however, plaintiff is dismissed from the action and has no further exposure to defendants over the property in dispute[.]").

103.    This threshold issue—whether interpleader is appropriate in a given case—is a question of law for the Court.  Wilson, *North Carolina Civil Procedure* § 22-3 & n. 24 ("[T]here is little dispute that the first stage of interpleader is a matter

for the court."); *accord* 7 *Wright & Miller's Federal Practice & Procedure*, § 1718 (3d ed. 2025) ("Initially there is the question whether to permit interpleader.  On any view, this always must be a question for the court.").[14]

104.    Second, if the Court finds the plaintiff to be exposed to potential multiple liability and thus interpleader is appropriate, it then determines the adverse claims between the remaining defendants.  *Travelers Ins. Co. v. Keith*, 283 N.C. 577, 580 (1973) ("Thus each defendant is the adversary of the other and occupies the position of a plaintiff.").  Each party bears the burden of persuasion to establish his right to the disputed assets, and summary judgment is appropriate if only questions of law on undisputed facts remain.  *Id.*[15]

105.    Here, interpleader is appropriate.  Schwab is subject to competing claims to the Restrained Assets from two Defendants.

106.    Turning to the merits of the claim, as discussed at length above, the Court declares that the Restrained Assets belong solely to Ms. Marilley.  Consequently, the Court shall order Schwab: (1) to remove the restrictions on the Restrained Assets, and (2) disburse the Restrained Assets to Ms. Marilley, pursuant to

---

[14] When one of our Rules and a Federal Rule of Civil Procedure are similar, federal cases interpreting that rule are pertinent for the Court's consideration.  *Slattery v. Appy City, LLC*, 385 N.C. 726, 736 n. 12 (2024).

[15] In the meantime, the Court may, but need not, require the party in control of the disputed assets to deposit them with the clerk of court.  *See* N.C. R. Civ. P. 22(b).  To avoid tax liability, Schwab has not liquidated the assets or deposited funds with the clerk of court.  Instead, it has restrained them so that they cannot be traded or withdrawn pending a determination in this matter.

her instructions.  The Court shall further discharge Schwab of liability to either Defendant respecting ownership of the Restrained Assets (but not to the extent Schwab seeks an order stating that it bears no responsibility to Mr. Marilley for the circumstances leading to the transfer of the Restrained Assets to an account owned solely by Ms. Marilley), and dismiss it from this case.

## VI.      CONCLUSION

107.  For all the foregoing reasons, the Court concludes as a matter of law that no genuine issue of material fact remains as to Ms. Marilley's sole ownership of the Restrained Assets.  The Court further concludes that Mr. Marilley's proposed amendment would be futile and comes too late.  Finally, the Court concludes that Schwab has properly invoked the interpleader procedure of Rule 22.

108.  **WHEREFORE**, the Court **ORDERS** as follows:

   a. Ms. Marilley's Motion for Summary Judgment Motion is **GRANTED**.  The Court **DECLARES** that Ms. Marilley is the sole and rightful owner of the Restrained Assets, as that term is used in the Complaint for Interpleader, (ECF No. 3).

   b. The Court, in its discretion, **DENIES** Mr. Marilley's Motion to Amend.

   c. The Court **GRANTS in part** and **DENIES in part** Schwab's Motion for Interpleader, **DISMISSES** Schwab from this action, and **DISCHARGES** it of liability with respect to ownership of the Restrained Assets.  Schwab shall immediately disburse the Restrained Assets to Ms. Marilley, pursuant to her instructions.  The

Court **DENIES** the Motion for Interpleader to the extent Schwab seeks an order stating that it bears no responsibility to Mr. Marilley for the circumstances leading to the transfer of the Restrained Assets to an account owned solely by Ms. Marilley.

d. The Court reserves for later determination the issue of costs and the claim for attorneys' fees raised in Ms. Marilley's Motion for Sanctions, (ECF No. 78). *See Duncan v. Duncan*, 366 N.C. 544, 546 (2013) (recognizing trial court may "reserve[ ] for later determination collateral issues such as attorneys' fees").

**SO ORDERED**, this the 23rd day of January 2026.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases